**UNITED STATES of America,**

v.

**Gaetano DE VIVO, Defendant.**

**No. 60–Cr.–323.**

United States District Court
E. D. New York.

Jan. 10, 1961.

Cornelius W. Wickersham, Jr., U. S. Atty., E. D. New York, Brooklyn, N. Y., for the United States; Joseph J. Marcheso, Asst. U. S. Atty., Brooklyn, N. Y., of counsel.

Leon Ruby, New York City, for defendant; Donald N. Ruby, New York City, of counsel.

BARTELS, District Judge.

Pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, 18 U.S.C. A., defendant moved to suppress evidence, consisting of certain merchandise seized by Special Agents of the Federal Bureau of Investigation on April 20, 1960 in his garage and apartment located at 1930 85th Street, Brooklyn, N. Y.

The issue here is whether or not defendant gave his permission voluntarily and freely to the F.B.I. agents to search his garage and also his apartment. As in most of such applications, there exists a sharp conflict between the testimony offered by the Government and the testimony offered by the defendant.

According to the testimony of the agents, defendant and his son were working on the morning in question on the defendant's automobile standing in the defendant's driveway, when three F.B.I. agents approached and showed them their respective badges and credentials. Agent Martin then asked defendant, "Do you mind if we look in your garage?", to which the defendant answered "No, not at all" and told his son John to obtain the key from the automobile. Agent Martin also asked the defendant "Do you mind if we search your car?", to which the agent received the same answer. The car was then searched and the defendant led the way to the garage, unlocked the garage and opened it. He did not ask for any warrant at any time nor did any of the agents threaten the defendant or threaten to break the door. In the garage there were several cartons of merchandise, several empty cartons and various tools. Agent Martin asked the defendant about the merchandise and he replied that two weeks ago he had been contacted by a third party who came to his house in an automobile which was followed by a red truck; that this party parked the truck but was compelled to return the truck and thereafter rented defendant's garage to store the merchandise that was in the truck; that as rental for the garage this third party, whose name and address defendant did not know, promised defendant $200 but since the defendant did not receive the money this third person thereafter paid the defendant rent by giving him a portion of the merchandise which defendant had removed to his apartment on the third floor of the adjoining house. The agents then asked if they could see the merchandise in the house and the defendant said "Yes, you can".

According to the agents, one of them (Fritschell) remained with defendant's son John at the garage while the de-

fendant and the other two agents entered the house and defendant's apartment on the third floor after defendant had opened both doors. There was no threat to break the doors open and no one asked the agents for a search warrant. In the third floor apartment considerable amounts of merchandise were found, which were inventoried and removed by the agents. Defendant signed the inventory receipts but refused to sign a statement recounting what happened as recorded by the agents. All three agents testified substantially to the same effect. Two other agents arrived after the search was made, one of whom made an inventory of the merchandise in the garage while defendant's son John watched him, and the other of whom brought a truck to the premises and was helped by John in parking the same in the driveway.

The above recital of events was contradicted by defendant and his son John and in part by defendant's two daughters, all of whom were minors. Defendant testified that after the agents arrived and showed their credentials, they did not request permission to search the car or the garage but simply said "We are going to search the car" and as to the garage, demanded that the same be opened "or we will open it up". Again, according to the defendant, the agents did not request permission to search the apartment but simply stated "We are here and we are going to search the house", and that when they reached the third floor apartment one of the agents demanded that defendant "Open the door". In each instance the defendant inquired whether the agents had a search warrant and when they arrived inside of the apartment he said "You haven't a search warrant and you can't come in here". Defendant's son John corroborated defendant's testimony with respect to the search of the car, garage and apartment, testifying that he went with defendant and the agents when the search was made of the third floor apartment. The two daughters were in the apartment at the time and they corrobo-

rated defendant's testimony with respect to defendant's statement on arrival at the apartment protesting against the search without a warrant.

Defendant further testified that no conversation as to the merchandise or the rental of the garage was held until after the agents had completed their search of the garage and had coerced defendant into admitting the agents into his apartment. However, defendant did admit at this time that he said he rented his garage to a person whose name and address he did not know, for the storage of the merchandise, and that after the third person defaulted in paying $200 as rent, he received the merchandise in the third floor apartment in payment therefor. He added that the agents did not ask where the merchandise came from until after they were in the third floor apartment and that he did not make his explanation until both searches were completed.

In the Court's opinion, the testimony of the F.B.I. agents is more credible than the testimony of the defendant and his family. The testimony of both the defendant and his son John that the latter accompanied defendant into the house was denied not only by the agents who conducted the search but by the two agents who arrived later and found John at the garage. The statement that the defendant rented space in his garage to a person unknown and subsequently took merchandise in payment of the rent is a strain upon the Court's credulity. Again, the testimony that the agents did not ask defendant where the merchandise came from until after they reached the third floor apartment and the search was completed is difficult to swallow. If the defendant had continually protested the search as he now claims, there would have been no necessity at that late date for defendant to explain the merchandise found in his apartment as rent for storage of the merchandise in the garage. The fact that defendant refused to sign a statement indicates that he could resist requests or demands when he chose to do so. Finally, the cir-

cumstance that he never complained to the United States Commissioner or to the Assistant United States Attorney about the search without a warrant, also throws some doubt on his story.

Since, however, the issue is whether the consent to the search was voluntarily and freely given, the matter cannot be disposed of solely on the basis of relative credibility. It remains to be determined whether the account given by the agents, if true, sufficiently demonstrates voluntary and intelligent consent. Judd v. United States, 1951, 89 U.S.App.D.C. 64, 190 F.2d 649. The Court must decide whether the consent was "granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right." Johnson v. United States, 1948, 333 U.S. 10, 68 S.Ct. 367, 368, 92 L.Ed. 436. "Words or acts that would show consent in some circumstances do not show it in others." Higgins v. United States, 1954, 93 U.S. App.D.C. 340, 209 F.2d 819, 820. "Non-resistance to the orders or suggestions of the police is not infrequent * * *." Judd v. United States, supra, 190 F.2d at page 651.

■■ It is not enough therefore that the Court believes that a verbal consent was given. A second obstacle must be hurdled. The circumstances under which the consent was given must be examined to determine whether it was voluntary or coerced. Upon this point the burden remains upon the Government to prove by clear and convincing evidence that the consent to the search was free and voluntary. United States v. Martin, D.C. N.Y.1959, 176 F.Supp. 262; United States v. Gross, D.C.N.Y.1956, 137 F. Supp. 244.

■ Some cases hold that the circumstances of the defendant's plight is often such that the mere verbalization of a consent to a search by officers of the law after they have identified themselves is not a voluntary consent because it is not in accordance with human experience and can only be explained by physical or moral coercion. See Judd v. United States, supra [1]; Higgins v. United States, supra [2]; United States v. Busby, D.C.D.C.1954, 126 F.Supp. 845, 846 [3]; and United States v. Hoffenberg, D.C.N. Y.1938, 24 F.Supp. 989 [4], in all of which it was held that voluntary consent had not been given. From these cases it appears that the Courts have relied upon what they believed was the operation of the defendant's mind, based upon "human experience", which, as far as the Court is concerned, of necessity must be hypothetical rather than real. Although this may be explained by the desire to zealously protect the defendant's constitutional rights, in this circuit it appears that a more objective approach has been followed and that the "question of whether consent to a search is voluntary is one of fact". United States v. Martin, supra, (176 F.Supp. at page 268). While the circumstances of the consent must be carefully examined, more reliance seems to be placed upon objective evidence of

1. Defendant, arrested at night and booked on an "open charge", was interrogated by police for several hours. During questioning he was asked if he "minded" if the police searched his room and said he would not mind. A shoe was found which matched a footprint at the scene of a burglary.

2. Defendant was asked if police could speak to him in his room and he stated that would be "all right". In the room the officers said they believed he had narcotics which he denied, telling them they were "perfectly welcome to look anywhere in his room". Marihuana seeds and cigarettes were found.

3. Defendant, a known narcotics addict, was accosted on the street by officers and while denying possession of marihuana, permitted a search of his person which disclosed narcotics. A subsequent search of his room after arrest was held to have been consented to "free of duress or coercion".

4. Police told defendant they believed there was a fire hazard in his building and when asked the nature thereof stated that the hazard was the operation of an illegal still. Defendant denied operating a still and told the officers to "go ahead and search" the building. A still was found.

the state of mind and circumstances and the inherent probabilities arising therefrom. United States v. Adelman, 2 Cir., 1939, 107 F.2d 497; United States v. Dornblut, 2 Cir., 1958, 261 F.2d 949, 950; United States v. Martin, supra.

Believing the testimony of the agents which the Court found forthright, consistent and inherently probable, was the consent given by the defendant free of fear or pressure? Had the agents demanded the right to search the garage and the apartment as related by the defendant, then acquiescence to the demand would not have been freely given. Since, however, the agents requested, rather than demanded, permission to look in the garage and the apartment, a different picture is presented under the present circumstances. The facts in the case will not support a finding that defendant sought to "bluff" his way through a search, confident that the contraband was well hidden. Nor is this a case where the consent followed an admission of guilt. This is a case where defendant claims ignorance that the goods were contraband. If the defendant were ignorant of the contraband nature of the goods or of the illegality of any of his actions, there would be little or no reason for him to fear the result of the search or to refuse his consent thereto. See Higgins v. United States, supra. According to the agents, the defendant's story with respect to the rental of the garage was told to the agents at the time the garage was opened. Even the defendant admits that he made this explanation to the agents after completion of the search in the garage and in the apartment. While these statements as to how the merchandise was found in the garage and the apartment took place at least after the door of the garage had been opened, they are *objective* evidence of the defendant's state of mind *before* he gave consent to the search in both the garage and the apartment and this state of mind was ignorance of the taint upon the merchandise. See United States v. Busby, supra, 126 F.Supp. at page 846; In re Bull's Will, 1888, 14 Daly 510, 2 N.Y.S. 52, affirmed 111 N.Y. 624, 19 N.E. 503; 1 Wharton's Criminal Evidence (12 Ed.), 404–431. Assuming that after the storage of the merchandise defendant subsequently became suspicious as to its contraband nature, his voluntary consent could well be founded upon a desire to be cooperative and to shift the culpability elsewhere.[5] Under the circumstances of this case, consent without compulsion can readily be found.

The Court finds that the Government has sustained its burden and that consent to the search was freely and voluntarily granted, and that the motion to suppress must be denied.

Settle order within ten (10) days upon two (2) days' notice.

---

5. There is no question that the consent was intelligently given because the defendant testified that he knew that a search warrant was legally required.